No. 29,161.

SYLVESTER TOOL, *Appellee*, v. THE NATIONAL LIFE AND ACCIDENT INSURANCE COMPANY, *Appellant*.

(285 Pac. 580.)

Opinion filed March 8, 1930.

*P. W. Croker, George H. West,* both of Kansas City, *Frank W. McAllister, George W. Humphrey, John B. Pew* and *James W. Broaddus,* all of Kansas City, Mo., for the appellant.

*Henry E. Dean* and *Elmer E. Martin,* both of Kansas City, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one to recover on a life insurance policy. Plaintiff prevailed, and defendant appeals.

On January 18, 1926, Olive Tool signed an application for life in-

surance, payable to her husband, the plaintiff, Sylvester Tool. On February 1 the policy was delivered. On April 21 Mrs. Tool died of toxemia of the heart caused by exopthalmic goiter. The death certificate gave cause of death as myocarditis, contributing cause exopthalmic goiter. The proof of death as it appeared at the trial gave cause of death as goiter of long standing.

The application contained the following question and answer: "Are you in good health? A. Yes." The application also declared the answer was complete and true, and should form the basis of the contract of insurance. The defense pleaded in the answer to the petition was that the applicant was not in good health when she signed the application, and had been afflicted with exopthalmic goiter for many years. The application did not warrant good health, and an answer in good faith according to Mrs. Tool's understanding of good health was sufficient.

Dr. Paul Morton Krall testified Mrs. Tool may not have known she had an exopthalmic goiter. In the eyes of a layman that was possible. But the doctor did not say she may not have known she was not in good health, and he testified he did not believe it was possible for her to be unmindful of an exopthalmic goiter on January 18 which caused her death three months later. There was, however, some nonexpert testimony that Mrs. Tool was apparently in good health and spirits, and had no noticeable enlargement of the thyroid gland or throat or neck. Mrs. Tool's husband admitted she had had an operation for goiter some years before, which produced shortness of breath, nervousness, and fluttering of the heart, but he said that on January 18 and previously he did not notice a thing wrong.

Dr. John B. Paul treated Mrs. Tool from April 4 until she died. He could tell by observation what her trouble was, protrusion of the eyeballs and enlargement of the thyroid gland, and in his opinion an exopthalmic goiter could not come up and manifest itself in a period of twelve weeks, producing myocarditis resulting in death.

One of the witnesses who testified concerning Mrs. Tool's apparent good health was the agent who took the application. He was instructed by the company to observe applicants and determine whether they were in good health. He said he had known Mrs. Tool three or four or six months before the application was written, and he told about how clean she kept her house, how she helped her neighbors, how young and jolly she acted, and about her build, and

everything. Near the close of the trial, in an unguarded moment, he said Mrs. Tool was a perfect stranger to him when he wrote the application.

The jury returned the following special findings of fact:

"1. Did Olive Tool sign an application blank for insurance in the National Life and Accident Insurance Company, in which she was asked this question, 'Are you in good health?' A. Yes.

"2. If you answer the above question in the affirmative, state what answer Olive Tool made to such question. A. Yes.

"3. If you answer questions 1 and 2 in the affirmative, then state whether or not Olive Tool honestly believed that the answer she gave was true. A. Yes.

"4. At the time the application was signed, on January 18, 1926, was Olive Tool in good health? A. Yes."

The responsibility rested on the district court to say, not whether there was some evidence to support the findings, but whether the findings reflected the truth of the case under the evidence. The medical testimony was not controverted by medical testimony, and notwithstanding the evidence strongly tended to show that this is a rank case of deathbed insurance, the district court approved the findings. That concludes the controversy over the facts so far as this court is concerned.

The policy contained a provision that the company assumed no obligation unless the insured was in sound health on the day the policy was dated. The policy was dated February 1. In the course of the trial the attorney for defendant moved for an instructed verdict on the ground the policy did not become effective. The instructions to the jury are not brought up, but it appears the question was submitted to the jury, who returned the following findings of fact:

"8. Was Olive Tool in sound health on the first day of February, 1926? A. Yes.

"9. Was Olive Tool under the care of Dr. R. E. Barker on January 30, 1926? A. We don't know."

Dr. Robert E. Barker testified he was called to treat Mrs. Tool on January 31. Her symptoms of exopthalmic goiter were pronounced. The thyroid gland was very much enlarged, the patient had a toxic heart, her pulse was rapid, irregular, and weak, her breathing was difficult, and she was very weak. Tool said his wife's health was good in January, but he did not testify concerning her health in February, or tell when Doctor Barker was first called. Doctor

Barker was first called to the Tool home. Tool was present when the first examination was made, but he could not "remember" that Barker told him anything about what he treated her for. Tool made proof of death to the company the day after his wife died.

There were reasons why the jury should not care to depend on Doctor Barker's testimony. When he was visited by plaintiff's attorney before the trial, and was asked to give information concerning Mrs. Tool's case, Doctor Barker introduced the subject of an asthmatic condition. In explanation of his mention of asthma he said he was not under oath then. Under an irritating cross-examination he evaded giving direct answers to direct questions. He finally became quite uncertain about dates of visits. Besides that, the company's case was damaged by evidence indicating it had tampered with the proofs of death.

Eliminating Doctor Barker's testimony, there was evidence of sound health through January. This evidence was opposed by medical-expert testimony, not disputed by any expert witness, that Mrs. Tool could not have been in good health on January 18, or in sound health on February 1. The result is, we have the old, old question whether disputes respecting matters of fact depending for solution on oral testimony, shall be settled by trial juries and judges, or by this court.

In this connection the court may suggest that, in view of the company's method of writing insurance without medical examination of the applicant, on nonexpert observation of the applicant by the solicitor, and the applicant's statements, sound health in the policy should be regarded for all purposes the same as good health in the application.

The judgment of the district court is affirmed.

JOCHEMS, J., dissenting.